## BOLATIN-DRABKIN FURNITURE CO v BATTEN

Ohio Appeals, 7th Dist, Mahoning Co

No 2136.   Decided Nov 9, 1934

**OPINION**

By ROBERTS, J.

It is claimed by the defendant that reversible error occurred during the trial in the Court of Common Pleas in several respects.

"1. The court erred in overruling a motion of the defendant, notwithstanding the verdict is inconsistent with the findings of the jury in answer to the special interrogatories.

2. The court erred in refusing to direct a verdict for the defendant at the close of the plaintiff's evidence.

3. The court erred in refusing to direct a verdict for the defendant at the close of all of the evidence.

4. The verdict is against the weight of the evidence.

5. Misconduct on the part of the court which prevented the defendant from having a fair trial and which acts were prejudicial to the rights of the defendant."

Giving consideration to the first alleged error, the court submitted to the jury two interrogatories to be answered by it in returning a general verdict.

1. Did the defendant, The Bolatin-Drabkin Company, choose competent agents to occasionally make a general inspection of this Ford car? Answer. There was no evidence given whereby a general inspection was ever made of the Ford in question.

2. What caused this wheel to become severed from this Ford automobile? Answer. We do not know what caused the wheel to come off the Ford car.

It is the contention of the defendant that the answers to these interrogatories were so inconsistent with the general verdict that the motion for judgment in favor of the defendant should have been sustained, notwithstanding the verdict.

**Sec 11420-18 GC** provides as follows:

"When a special finding of facts is inconsistent with the general verdict the former shall control the latter and the court may give judgment accordingly."

In the case of **Davis v Turner, 69 Oh St, 101,** the third paragraph of the syllabi reads as follows:

"3. To be inconsistent with the general verdict as contemplated by §5202, Revised Statutes, it must appear that the special findings are irreconcilable, in a legal sense, with the general verdict; and to justify the court in setting aside or disregarding the general verdict on the ground that it is inconsistent with such special findings, the conflict must be clear and irreconcilable."

Some further statement of facts in the case, as disclosed by the evidence, is proper before further considering the issue thus raised.

The automobile in question was a 1929 To Dor sedan purchased by the defendant several years before the accident, without knowledge of its mileage when purchased or from the purchase to the time of the accident, on the part of the defendant or its employes. The defendant does an extensive business in the sale of furniture in the cities of Youngstown, Niles, in each of which it has stores, and in surrounding territory. Sidney Beck, at the time of the accident, was and had been for some time in the employment of the defendant as a collector. It was his custom to get bills for collection at the Youngstown store, and for the city of Niles and vicinity at the store in that city. It was the custom to make the Niles collection on Mondays. The automobile was stored in the garage of Beck in the southern part of the city, and as was his custom, on the morning of the accident

he left home for the purpose of collecting bills in and about the city of Niles, and pursuing the usual and ordinary rule he drove northerly on South Avenue to the place of the accident.

It may be suggested now that some question was made as to whether Beck at the time of the accident was acting in the course of his employment. This court is of the opinion that he was so engaged. He was going first to the Niles store to get the bills for collection for that particular trip. It was his duty to take the defendant's car out of his garage and proceed to Niles for the purpose of taking care of this business for the defendant. Perhaps it would have been a different proposition if his place of employment or performance of his services had been at some particular place in Niles, and he was going there for the purpose of entering upon the employment. Beck, however, was in the general service of the defendant and it was just as much a part of his duty to drive to Niles and see the debtors of the defendant and make collection, as it was to make the collection when he was already at the home of the debtor. If this theory of the defendant were correct then Beck would not have been in the employment of the defendant after he had made one collection and was proceeding to the home of another debtor. His was a general, regular employment, day by day, to perform this service of the master, and the duties so involved required a practically continuous driving upon the streets of these two cities and environments. The automobile was being operated on the easterly or proper side of South Avenue previous to the accident. Beck says that he was traveling at a speed of from twenty-five to thirty miles an hour. A witness, Mrs. Mary Mitchell, was standing at the intersection of these two streets, or opposite Marion Avenue, on the easterly side of South Avenue, and saw this automobile approaching and continued to observe it until after the accident. She says it was being operated at a speed of from forty-five to fifty miles per hour. It seems to be conceded that the pavement of South Avenue in this vicinity was somewhat rough and bumpy.

Referring to the first interrogatory the answer to which was, "There was no evidence given whereby a general inspection was ever made to the Ford in question", this answer was correct as the evidence does not disclose that any regular inspection of this automobile was ever made. Furthermore, it is not apparent from the evidence that inspections were ever generally made

or at any particular time, or otherwise than some casual observation when the car was in a shop for repairs. The president of the company in general charge of the business, Samuel Drabkin, disclaimed having made or having knowledge of inspections. The witness, Cameron D. Trott, who was the credit manager for the defendant and the superior of the driver Beck, did not make or cause inspections to be made, neither did the driver Beck. The car seems to have been continually in service and went to a shop for repairs when something broke, making them necessary. No examination was ever made as to the condition of this or any other wheel. It is uncertain, from the evidence, when the wheel was previously off the car. Mechanics testified that tire could be changed without taking off the wheel. There is some suggestion in the evidence that the tire may have been changed four or five weeks previous to the accident, but there is uncertainty as to the time and as to which wheel.

Some explanation or description was attempted by two witnesses, George Magnuson and W. J. Walpert, automobile mechanics employed in different places where this Ford car was ordinarily taken for repairs, as to how the wheels of this car were attached thereto. From what was said by these witnesses and bringing into consideration, perhaps, some general knowledge concerning this matter, it may be said that fastened to and projecting from the brake drum are five bolts spaced equal distances around the center of the brake drum and comprising a circumference of about six inches, which bolts are threaded upon the outer end. The hub of the wheel has five holes corresponding to the five bolts. To fasten the wheel upon the car the hub is placed against the brake drum so that these bolts protrude through their corresponding holes in the hub. These holes are countersunk and nuts used thereon are beveled so that when turned up on the thread the beveled part connects with the bevel of the counter-sink, so that greater resistance is offered a nut coming off. These five nuts are intended to be turned tightly upon and into the hub cap. This is a common and general form of construction of automobiles. Instances where the nuts have come off and allowed the wheel to separate from the car are exceedingly rare. It will be understood that the wheel cannot become detached until all of these nuts have turned backward about one inch on the thread and become detached from the bolts. Roughness of the pavement and speed of the automobile was under some discussion in this

case. However, it may be understood that any roughness of pavement or speed of the car immediately preceding the accident would not cause the wheel to come off, if previously thereto it was properly fastened on. It is inconceivable how this wheel could have become detached except by the gradual loosening and turning back of these nuts, caused by the jar of the operation of the car, contributing factors to which, presumably, would be speed and condition of the pavement. Furthermore, after these nuts began to loosen, the wheel would be loosely attached, would wabble and creak, presumably for a considerable time until these nuts were jarred fully off from the bolts. The conclusion is upon this proposition, that the cause of this accident was the gradual loosening of the nuts which must have occupied a considerable space of time and covered considerable mileage. The loosening of the wheel and the wabbling resulting, and noise of such condition, should, in the exercise of ordinary care, have been observed, and the dangerous condition corrected before an accident resulted. This condition could have been determined by regular or casual inspections or by ordinary observation, and it is difficult to understand how such condition could have gone unnoticed until the wheel became severed from the car. The nuts are on the outside of the hub and in full view.

The jury, in answer to the second interrogatory as to the causes of the accident, said, "We do not know what caused the wheel to come off the car." The jury had been carefully and explicitly instructed by the court with regard to the manner of its consideration of the evidence in the case, and had been directed that to find for the plaintiff it must find by the greater weight of the evidence that there was negligence on the part of the defendant which was a proximate cause of the accident. The instructions indicated to the jury that it was not its duty in determining the issues to find a positive or absolute cause or ground of negligence, but that the issues were determined by the greater probabilities. No instructions were given to the jury in connection with or regarding the interrogatories. Evidently the jury understood from that question that it was expected to give some absolute, specific certain cause for the accident, which, as indicated by what has been said as to the nature of the accident, it could not do. Presumably, if the jury had understood that this interrogatory could be determined upon the greater probabilities, or the preponderance of the evidence, it would have answered differently. The jury, by its verdict, found in favor of the plaintiff and must, thereby, have found the defendant guilty of actionable negligence.

Among other grounds of negligence it was alleged in the amended petition, "3. That the said defendant's agent and employe was reckless and careless in allowing said automobile to be operated over and upon the public highway without having said car in proper running order and condition." This court is of the opinion that this alleged ground of negligence was sufficiently established by the evidence; that the defendant should have known the condition of this car previous to the accident.

This answer to the interrogatory, as herein suggested, is reconcilable with the general verdict and the court did not err in refusing to enter judgment for the defendant, notwithstanding the verdict.

From what has already been said it will be apparent that the court did not err in refusing to direct a verdict at the close of the plaintiff's evidence, at the close of all of the evidence, and that the verdict is not against the weight of the evidence.

The last complaint is that of misconduct on the part of the court. This is claimed to have occurred during the testimony of Driver Beck, where the following appears: Q. Did you see the man taken away in the automobile while you were at the scene of the accident. A. I have not seen him. Court: You went away before he was taken away? A. I was in a hurry to report the accident. There was no store or anything that would have a 'phone and I wanted to report the accident. Mr. Scanlon: I object to the remark the court made. I think it is highly prejudicial. Court: I am only asking whether he went away from the scene of the accident before the man was taken away. I want to know the fact of the matter. The answer is 'Yes', is that it?

It is not observable that anything that was said by the court in this connection would or could result prejudicially to the defendant. The witness is testifying as to what he had seen and knew about the accident, and then with regard to the plaintiff who was lying upon the sidewalk. Whether the witness was there or had left for some purpose might have an important bearing upon the testimony. In any event, it is not apparent that the jury would be prejudiced by reason of anything the court said in this connection.

In another place complaint is made of misconduct on the part of the court, which

time will not be taken to quote as it appears to be wholly harmless.

The final conclusion is reached that the judgment of the Court of Common Pleas should be and is affirmed.

LYNCH and SMITH, JJ, concur.